# **EXHIBIT B**

Certificate of Incorporation of KPI Intermediate Holdings, Inc.



# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE RESTATED CERTIFICATE OF "KPI INTERMEDIATE HOLDINGS, INC.", FILED IN THIS OFFICE ON THE TWELFTH DAY OF JANUARY, A.D. 2018, AT 3:24 O`CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.



Jeffrey W. Bullock, Secretary of State

4572889  8100
SR# 20180234514

Authentication: 201966329
Date: 01-12-18

You may verify this certificate online at corp.delaware.gov/authver.shtml

# KPI INTERMEDIATE HOLDINGS, INC.
## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

(Pursuant to Sections 242 and 245 of the
General Corporation Law of the State of Delaware)

KPI Intermediate Holdings, Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "**General Corporation Law**"), does hereby certify as follows.

1. The name of this corporation is KPI Intermediate Holdings, Inc. (the "**Corporation**") and this corporation was originally incorporated pursuant to the General Corporation Law on July 9, 2008.

2. The Board of Directors of this corporation duly adopted resolutions proposing to amend and restate the Certificate of Incorporation of this corporation, declaring said amendment and restatement to be advisable and in the best interests of this corporation and its stockholders, and authorizing the appropriate officers of this corporation to solicit the consent of the stockholders therefor, which resolution setting forth the proposed amendment and restatement is as follows.

> RESOLVED, that the Certificate of Incorporation of this corporation be amended and restated in its entirety to read as set forth on Exhibit A attached hereto and incorporated herein by this reference.

3. Exhibit A referred to above is attached hereto as Exhibit A and is hereby incorporated herein by this reference. This Amended and Restated Certificate of Incorporation was approved by the holders of the requisite number of shares of this corporation in accordance with Section 228 of the General Corporation Law.

4. This Amended and Restated Certificate of Incorporation, which restates and integrates and further amends the provisions of this corporation's Certificate of Incorporation, has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law.

IN WITNESS WHEREOF, this Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of this corporation on this 12th day of January, 2018.

By: /s/ Thomas M. Wolf
Name: Thomas M. Wolf
Title:   Vice President

State of Delaware
Secretary of State
Division of Corporations
Delivered  03:24 PM 01/12/2018
FILED  03:24 PM 01/12/2018
SR  20180234514  -  File Number  4572889

EXHIBIT A

KPI INTERMEDIATE HOLDINGS, INC.

AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

## ARTICLE I
## NAME

The name of this corporation is: KPI Intermediate Holdings, Inc. (the "**Corporation**").

## ARTICLE II
## REGISTERED OFFICE

The address of the registered agent of the Corporation in the State of Delaware is 1209 Orange Street in the City of Wilmington, 19801, County of New Castle. The name of its registered agent at that address is The Corporation Trust Company.

## ARTICLE III
## PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

## ARTICLE IV
## AUTHORIZED SHARES

The total number of shares of all classes of stock which the Corporation shall have authority to issue is 1400 shares of capital stock, consisting of (a) 1000 shares of Common Stock, par value $0.001 per share (the "**Common Stock**") and (b) 400 shares of Preferred Stock, par value $0.001 per share (the "**Preferred Stock**"). The powers, preferences, privileges, rights, restrictions, and other matters relating to the Preferred Stock and Common Stock are as follows:

A.   **COMMON STOCK**

1.   <u>General</u>. The voting, dividend and liquidation rights of the holders of the Common Stock are subject to and qualified by the rights, powers and privileges of the holders of the Preferred Stock set forth herein.

2.   <u>Voting</u>. The holders of the Common Stock are entitled to one vote for each share of Common Stock held at all meetings of stockholders (and written actions in lieu of meetings). There shall be no cumulative voting rights. The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of shares of capital stock of the Corporation representing a majority of the votes represented by all outstanding shares of capital stock of the Corporation entitled to vote, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

3.    <u>Dividends</u>.  Dividends may be declared and paid on the Common Stock from funds lawfully available therefore as and when determined by the Board of Directors of the Corporation (the "**Board**"), subject to any preferential dividend rights of any then outstanding Preferred Stock.

4.    <u>Liquidation</u>.  Upon the dissolution or liquidation of the Corporation, whether voluntary or involuntary, holders of the Common Stock will be entitled to receive all assets of the Corporation available for distribution to its stockholders, subject to any preferential rights of any then outstanding Preferred Stock.

## B.    SERIES A PREFERRED STOCK

All of the shares of the Preferred Stock of the Corporation are hereby designated "Series A Preferred Stock" with the following rights, preferences, powers, privileges, restrictions, qualifications and limitations.   Unless otherwise indicated, references to "sections" or "subsections" in this <u>Part B</u> of this <u>Article IV</u> refer to sections and subsections of <u>Part B</u> of this <u>Article IV</u>.

1.    <u>Definitions</u>.

1.1    "**A&R LLC Agreement**" means that certain Third Amended and Restated Limited Liability Company Agreement of KPI Holdings, LLC dated as of January 12, 2018.

1.2    "**Affiliate**" means any entity that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the specified party.  For the purposes of this definition, partnerships, joint ventures or similar entities where a majority in interest of the partners, venturers or other members are a party hereto and/or Affiliates of a party hereto also shall be deemed to be Affiliates of such party.

1.3    "**Base Amount**" means the Original Issue Price plus any additional amounts added to the Base Amount from time to time pursuant to <u>Subsection 3.1</u>.  For the avoidance of doubt, Base Amount shall include accrued Dividends to the extent unpaid for at least one quarter in arrears and shall not include accrued Dividends that have not yet unpaid for at least one quarter in arrears or Dividends that have been paid by the Corporation in cash (including Dividends declared pursuant to <u>Subsection 3.2</u> and <u>Subsection 3.3</u>).

1.4    "**Business**" means the business of manufacturing, designing and selling engineered, nonferrous (primarily aluminum, magnesium and zinc) die casting products and solutions, and tools and dies, for third party customers across a diverse range of automotive and non-automotive end markets.

1.5    "**Change of Control**" means a transaction or a series of related transactions (including, without limitation, any stock acquisition, reorganization, merger or consolidation) pursuant to which (i) the holders of capital stock of (or equity interests in) the Corporation, any of its material Subsidiaries or KPI Holdings, LLC, as applicable, immediately prior to such transaction or series of related transactions no longer hold, directly or indirectly, through one or more intermediaries, immediately after such transaction or series of related transactions, at least seventy-five percent (75%) of the total voting power of the Corporation, any

2

of its material Subsidiaries or KPI Holdings, LLC, as applicable, or such other surviving or resulting entity (or if the Corporation, any of its material Subsidiaries, KPI Holdings, LLC, or such other surviving or resulting entity is a wholly-owned Subsidiary immediately following such acquisition, its parent) or (ii) a Person or Persons acquire all or substantially all of the assets of the Corporation and its Subsidiaries on a consolidated basis.

1.6     "control" (including, with correlative meaning, "controlled by" and "under common control with") means the direct or indirect ownership or control of securities possessing at least 50% of the voting power of all outstanding voting securities of an entity or the power otherwise to direct or cause the direction of the management and policies of such entity (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

1.7     "Equity Securities" means any and all shares of Common Stock or Preferred Stock, and any and all securities of the Corporation convertible into or exchangeable or exercisable for (whether or not subject to contingencies or the passage of time, or both), such shares, including, without limitation, options, warrants and other rights to acquire such shares.

1.8     "Key Employees" means chief executive officer, chief financial officer, chief operating officer and head of sales.

1.9     "Letter Agreement" means that certain letter agreement, dated as of January 12, 2018, by and among the Corporation, Macquarie Septa, Macquarie Sierra, KPI Holdings, LLC, Kenner Equities IV, L.P. and KPI Holdings, Inc.

1.10     "Macquarie Septa" means Macquarie Septa (US) I, LLC, a Delaware limited liability company.

1.11     "Macquarie Sierra" means Macquarie Sierra Investment Holdings Inc., a Delaware corporation.

1.12     "Macquarie Holders" means Macquarie Septa, Macquarie Sierra, and any Person to which Macquarie Septa or Macquarie Sierra transfers any shares of Series A Preferred Stock in accordance herewith.

1.13     "Management Agreement" means the Amended and Restated Management Consulting Agreement dated as of June 30, 2015 between KPI Holdings, Inc. and Kenner Equity Management, LLC.

1.14     "Multiplier Amount" means, with respect to a redemption of the Series A Preferred Stock occurring (i) on or after the Closing Date and prior to the first anniversary of the Closing Date, 1.25, (ii) on or after the first anniversary of the Closing Date and prior to the second anniversary of the Closing Date, 1.35 and (iii) on or after the second anniversary of the Closing Date, 1.40.

1.15     "Original Issue Price" means $100,000 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series A Preferred Stock.

1.16    "**Pace Companies**" means the Corporation and its Subsidiaries, with each such entity a "**Pace Company.**"

1.17    "**Person**" means any individual, corporation, limited liability company, limited or general partnership, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

1.18    "**Refinancing**" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, modify, supplement, restructure, refund or repay, or to issue other indebtedness, in exchange or replacement for, such indebtedness.

1.19    "**Related Party**" means, with respect to any specified Person:  (i) any Affiliate of such specified Person, or any director, executive officer, general partner or managing member of such Affiliate; (ii) any Person who serves as a director, executive officer, partner, member or in a similar capacity of such specified Person; or (iii) any other Person who holds, individually or together with any Affiliate of such other Person more than 5% of the outstanding equity or ownership interests of such specified Person.

1.20    "**Restated Certificate**" means this Amended and Restated Certificate of Incorporation.

1.21    "**Senior Note Agreement**" means that certain Senior Note Agreement, dated as of June 30, 2015, by and among Pace Industries, Inc., Pace Industries, LLC, Alloy Resources, LLC, Muskegon Castings, LLC, as Issuers (as defined therein), TCW Asset Management Company, as administrative and collateral agent, and the other parties thereto, as amended by (i) that certain First Amendment to Senior Note Agreement, dated October 27, 2015, (ii) that certain Second Amendment to Senior Note Agreement, dated October 26, 2016, (iii) that certain Third Amendment to Senior Note Agreement, dated April 21, 2017, (iv) that certain Fourth Amendment to Senior Note Agreement, dated May 11, 2017, (v) that certain Fifth Amendment to Senior Note Agreement, dated June 12, 2017, (vi) that certain Sixth Amendment to Senior Note Agreement, dated September 13, 2017, (vii) that certain Seventh Amendment to Senior Note Agreement, dated November 21, 2017, (viii) that certain Eighth Amendment to Senior Note Agreement, dated December 15, 2017, (ix) that certain Ninth Amendment to Senior Note Agreement, dated December 29, 2017, and (x) that certain Tenth Amendment to Senior Note Agreement, dated January 12, 2018, as the same may be amended from time to time (such amendments, for the avoidance of doubt, being subject to <u>Section 6</u>).

1.22    "**Subscription Agreement**" means that certain Investment and Subscription Agreement, dated as of January 12, 2018, by and among KPI Holdings, LLC, the Corporation, Macquarie Septa and Macquarie Sierra.

1.23    "**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, boards or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company,

partnership, association or other business entity, a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control the managing director, general partner or similar controlling Person of such limited liability company, partnership, association or other business entity.

1.24 "**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to such a sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition.

1.25 "**Working Capital Facility Agreement**" means that certain Amended and Restated Credit Agreement for a Revolving Credit Facility, dated June 30, 2015, by and among Pace Industries, LLC, Pace Industries, Inc., Pace Industries of Mexico, LLC, Muskegon Castings, LLC and Alloy Resources, LLC, as Borrowers (as defined therein), the Bank of Montreal, as the Administrative Agent (as defined therein), and the other parties thereto, as amended by (i) that certain First Amendment to Amended and Restated Credit Agreement, dated October 27, 2015, (ii) that certain Second Amendment to Amended and Restated Credit Agreement, dated October 26, 2016, (iii) that certain Third Amendment to Amended and Restated Credit Agreement, dated November 10, 2016, (iv) that certain Fourth Amendment to Amended and Restated Credit Agreement, dated April 21, 2017, (v) that certain Fifth Amendment to Amended and Restated Credit Agreement, dated May 11, 2017, (vi) that certain Sixth Amendment to Amended and Restated Credit Agreement, dated June 12, 2017, (vii) that certain Seventh Amendment to Amended and Restated Credit Agreement, dated September 13, 2017, (viii) that certain Eighth Amendment to Amended and Restated Credit Agreement, dated November 21, 2017, (ix) that certain Ninth Amendment to Amended and Restated Credit Agreement, dated December 15, 2017, (x) that certain Tenth Amendment to Amended and Restated Credit Agreement, dated December 29, 2017, and (xi) that certain Eleventh Amendment to Amended and Restated Credit Agreement, dated 12, 2018, as the same may be amended from time to time (such amendments, for the avoidance of doubt, being subject to Section 6).

2. Issuance. Subject to the approval rights contained in Section 6, authority is hereby expressly granted to the Board to issue shares of Series A Preferred Stock from time to time. Series A Preferred Stock shall be construed to constitute a different class of shares for the purposes of voting by classes.

3. Dividends.

3.1 From and after the date hereof (the "**Closing Date**"), dividends shall accrue on such shares of Series A Preferred Stock at the rate per annum equal to eleven and one quarter percent (11.25%) (or, to the extent not paid in arrears in cash in any quarter, twelve percent (12%)) of the Base Amount from the date hereof (the "**Dividends**"). Dividends shall

accrue from day to day at the applicable rate, whether or not declared, and shall be cumulative and compounded quarterly. Except as set forth in Subsection 3.2, Section 8 or in Subsection 4.1, such Dividends shall be payable quarterly in arrears in cash only when, as, and if declared by the Board. Dividends not paid in cash on the date payable shall increase the Base Amount by an amount equal to such Dividends, and dividends paid in cash that are in excess of the amount payable shall decrease the Base Amount by the amount of such excess (but in no event shall the Base Amount be less than the Original Issue Price). The Corporation shall not declare, pay or set aside any dividends on shares of any class or series of capital stock of the Corporation junior to the liquidation preference of the Series A Preferred Stock while any shares of Series A Preferred Stock remain outstanding.

3.2     Notwithstanding anything to the contrary in Subsection 3.1 or otherwise, unless prohibited by Delaware law, at least one (1) business day prior to the Mandatory Redemption of Series A Preferred Stock (or, if earlier, one (1) business day prior to any Board authorization to redeem such Series A Preferred Stock), the Corporation shall declare a dividend with respect to such shares of Series A Preferred Stock, payable in cash not later than the date of such Mandatory Redemption, equal to the greater of (a) the Dividends that are unpaid and accrued through the date of the Mandatory Redemption with respect to such shares of Series A Preferred Stock or (b) the Make-Whole Amount with respect to such shares of Series A Preferred Stock, and such declared dividends shall be paid not later than the date of such Mandatory Redemption. For purposes of this Subsection 3.2 and Subsection 3.3, the "Make-Whole Amount" shall equal (i) the Multiplier Amount times the Original Issue Price of the shares of Series A Preferred Stock subject to the Mandatory Redemption, minus (ii) the Original Issue Price of such shares, minus (iii) all Dividends paid in cash with respect to such shares through the date of such declaration (disregarding, for the avoidance of doubt, dividends paid pursuant to the first sentence of this Subsection 3.2), minus (iv) any amounts received by the Macquarie Holders directly from KPI Holdings, LLC in respect of the Macquarie Units (as defined in the A&R LLC Agreement) (other than amounts received by the Macquarie Holders pursuant to Section 7.03 of the A&R LLC Agreement) through the date of such declaration. To the extent so declared, an amount equal to the amount of Dividends described in clause (a) paid in cash pursuant to this Subsection 3.2 shall reduce the Base Amount of the shares that are the subject of such Mandatory Redemption by an amount equal to the unpaid Dividends on such shares of Series A Preferred Stock that have accrued and increased the Base Amount through the date of the Mandatory Redemption (it being understood that if the Make-Whole Amount is paid pursuant to this Subsection 3.2, the Base Amount of the shares that are the subject of such Mandatory Redemption shall be reduced by an amount equal to the unpaid Dividends on such shares of Series A Preferred Stock that have accrued and increased the Base Amount through the date of the Mandatory Redemption).

3.3     Notwithstanding anything to the contrary in Subsection 3.1 or otherwise, unless prohibited by Delaware law, the Corporation shall not be entitled to exercise its right to redeem shares of Series A Preferred Stock pursuant to Subsection 8.1 unless at least one (1) business day prior to such Optional Redemption (or, if earlier, one (1) business day prior to any Board authorization to redeem such Series A Preferred Stock), the Corporation shall have declared a dividend with respect to such shares of Series A Preferred Stock, payable in cash not later than the date of such Optional Redemption, equal to the greater of (a) the Dividends that are unpaid and accrued through the date of the Optional Redemption with respect to such shares of

Series A Preferred Stock or (b) the Make-Whole Amount with respect to such shares of Series A Preferred Stock, and such declared dividends shall be paid not later than the date of such Optional Redemption.  To the extent so declared, an amount equal to the amount of Dividends described in clause (a) paid in cash pursuant to this Subsection 3.2 shall reduce the Base Amount of the shares that are the subject of such Optional Redemption by an amount equal to the unpaid Dividends on such shares of Series A Preferred Stock that have accrued and increased the Base Amount through the date of the Optional Redemption (it being understood that if the Make-Whole Amount is paid pursuant to this Subsection 3.3, the Base Amount of the shares that are the subject of such Optional Redemption shall be reduced by an amount equal to the unpaid Dividends on such shares of Series A Preferred Stock that have accrued and increased the Base Amount through the date of the Optional Redemption).

4.    Liquidation, Dissolution or Winding Up; Certain Mergers, Consolidations and Asset Sales.

4.1    Preferential Payments to Holders of Series A Preferred Stock.  Subject to Subsection 3.2, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation (a "Liquidation Event"), if, prior to such Liquidation Event, the holders of shares of Series A Preferred Stock have not received in the aggregate the sum of (i) the aggregate amounts required to be declared as a dividend pursuant to Subsection 3.2 and (ii) the aggregate Mandatory Redemption Price payable in respect of all outstanding shares of Series A Preferred Stock pursuant to Section 8.2, the holders of shares of Series A Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its stockholders before any payment shall be made to the holders of any other series of Preferred Stock or any Common Stock by reason of their ownership thereof, an aggregate amount equal to the sum of the amounts set forth in clauses (i) and (ii).  If upon any such Liquidation Event, the assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of shares of Series A Preferred Stock the full amount to which they shall be entitled under this Subsection 4.1, the holders of shares of Series A Preferred Stock shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

4.2    Payments to Holders of Other Series of Preferred Stock or Common Stock.  After the payment in full to the holders of the Series A Preferred Stock of the amount set forth in the first sentence of Subsection 4.1, the remaining assets and funds of the Corporation legally available for distribution (in each case, only to the extent permitted under applicable law), if any, shall be distributed among the holders of shares of Common Stock, *pro rata* based on the number of shares of Common Stock held by each such holder.

5.    Voting.  Except as expressly contemplated in the Letter Agreement, in Section 6 or elsewhere herein, the holders of Series A Preferred Stock shall have no voting rights.

6.    Series A Preferred Stock Protective Provisions.

6.1     So long as any share of Series A Preferred Stock remains outstanding, the following actions of the Corporation or any of its Subsidiaries (whether undertaken directly or indirectly, by amendment, merger, consolidation or otherwise) shall require the written consent or affirmative vote of the holders of a majority in interest of the Series A Preferred Stock, given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such action taken without such consent or vote shall be null and void *ab initio*, and of no force or effect:

6.1.1    amending, repealing or altering this Restated Certificate (whether by merger, consolidation or otherwise) or the Bylaws in a manner that is adverse to the powers, preferences and relative participation, optional or other special rights, qualifications, obligations, limitations or other restrictions on the Series A Preferred Stock, including without limitation thereof the consent rights set forth in this <u>Section 6</u>, dividend rights, redemption privileges and obligations and liquidation preferences;

6.1.2    other than payments under the Management Agreement as in effect on the date hereof, directing, approving or otherwise allowing any transaction by any Pace Company with or involving any Related Party of any Pace Company that is not approved by the disinterested members of the Board and effected on an arm's length basis;

6.1.3    directing, adopting or approving any plan of liquidation, dissolution or winding-up of any Pace Company and any voluntary bankruptcy or similar filing by any Pace Company;

6.1.4    (i) approving or creating any new class or series of Equity Securities with (A) a liquidation preference that is *pari passu* with or senior to the Series A Preferred Stock or (B) any other rights that are senior to the Series A Preferred Stock, or (ii) amend or modify any existing class or series of Equity Securities such that (A) the liquidation preference thereof is *pari passu* with or senior to the Series A Preferred Stock or (B) any other rights thereof are senior to the Series A Preferred Stock;

6.1.5    increasing the number of authorized shares of Series A Preferred Stock;

6.1.6    issuing any shares of Series A Preferred Stock following the issuance of Series A Preferred Stock to Macquarie Septa and Macquarie Sierra as of the Closing Date;

6.1.7    incurring any Indebtedness (as defined in the Senior Note Agreement) other than (i) making Revolving Borrowings (as defined in the Working Capital Facility Agreement) in accordance with and subject to the terms and conditions of the Working Capital Facility Agreement; <u>provided</u>, that the proceeds of such Revolving Borrowings are not used to acquire the securities, equity interests or assets (other than, with respect to assets, ordinary course inventory, equipment or similar purchases in the ordinary course of business) of any Person, or for the acquiring by any other manner of any business, properties, assets (other than, with respect to assets, ordinary course inventory, equipment or similar purchases in the ordinary course of business) or Persons; (ii) Indebtedness of any Note Party (as defined in the

8

Senior Note Agreement) under the Senior Note Documents (as defined in the Senior Note Agreement); (iii) Indebtedness under any premium finance agreement or any standby letter of credit, in each case, listed on Schedule 2.5(c) of the Subscription Agreement and any refinancings, refundings, renewals or extensions thereof; provided, that (a) the amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension in connection with such refinancing, (b) the average life to maturity of any refinancing, refunding, renewal or extension of such Indebtedness permitted hereby is not less than the then average life to maturity of the Indebtedness so refinanced or replaced, (c) the direct or contingent obligors with respect to such Indebtedness are not changed as a result of or in connection with such refinancing, refunding, renewal or extension, (d) any refinancing, refunding, renewal or extension of Indebtedness subordinated to the Senior Obligations (as defined in the Senior Note Agreement) shall be on terms no less favorable to the holders of the Notes (as defined in the Senior Note Agreement), and no more restrictive to the Note Parties, than the terms of the Indebtedness being refinanced, refunded, renewed or extended and in an amount not greater than the amount of such Indebtedness outstanding at the time thereof, (e) the interest rate applicable to any such refinancing, refunding, renewing or extending Indebtedness does not exceed the interest rate for the Indebtedness being refinanced, refunded, renewed, or extended, and (f) such refinancing, renewal, or extension does not impair or restrict, in any material respect, greater than the documents governing the Indebtedness being refinanced, refunded, renewed or extended, the ability of the Note Parties to make distributions or transfer money and other property to or otherwise enter into transactions among the other Note Parties; (iv) Guarantees (as defined in the Senior Note Agreement) of (A) the Senior Obligations, (B) the obligations under the Working Capital Facility Agreement and (C) other Indebtedness in an aggregate principal amount not to exceed $375,000 at any time outstanding; (v) obligations (contingent or otherwise) of the Issuers (as defined in the Senior Note Agreement) existing or arising under any Swap Contract (as defined in the Senior Note Agreement) with respect to natural gas, Mexican Pesos or interest rate caps, in each case, to the extent constituting Permitted Credit Product Obligations (as defined in the Senior Note Agreement); provided, that (a) such obligations are (or were) entered into by such Person in the Ordinary Course of Business (as defined in the Senior Note Agreement) for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, cash flows or property held or reasonably anticipated by such Person, or changes in the value of securities issued by such Person, and not for purposes of speculation or taking a "market view" and (b) such Swap Contract does not contain any provision exonerating the non-defaulting party from its obligation to make payments on outstanding transactions to the defaulting party; (vi) Indebtedness of the Issuers in respect of Capital Leases (as defined in the Senior Note Agreement), Synthetic Lease Obligations (as defined in the Senior Note Agreement) and purchase money obligations for real property and fixed or capital assets within the limitations set forth in clause (ix) of paragraph 6A of the Senior Note Agreement; provided, however, that the aggregate amount of all such Indebtedness at any one time outstanding shall not exceed $5,000,000; (vii) the endorsement of negotiable instruments for deposit or collection or similar transactions in the Ordinary Course of Business; (viii) Indebtedness of Foreign Subsidiaries (as defined in the Senior Note Agreement) in an aggregate principal amount at any time outstanding not to exceed $1,500,000; (ix) unsecured Indebtedness of (a) any Issuer or any other Note Party that is (x) a Domestic Subsidiary (as defined in the Senior Note Agreement) and (y) either the Corporation or a Subsidiary of the Corporation, owing to any Issuer or any other Note Party that is (x) a Domestic Subsidiary and (y) either the Corporation or a Subsidiary of the

Corporation, (b) any Note Party that is (x) a Foreign Subsidiary and (y) either the Corporation or a Subsidiary of the Corporation, owing to any other Note Party that is (x) a Foreign Subsidiary and (y) either the Corporation or a Subsidiary of the Corporation, (c) any Note Party that is (x) a Foreign Subsidiary and (y) either the Corporation or a Subsidiary of the Corporation, owing to any Issuer or any other Note Party that is (x) a Domestic Subsidiary and (y) either the Corporation or a Subsidiary of the Corporation, in an aggregate amount not to exceed $1,500,000 at any time outstanding and (d) any Mexican Subsidiary (as defined in the Senior Note Agreement) owing to any Issuer to the extent consisting of Investments (as defined in the Senior Note Agreement) permitted pursuant to paragraph 6C(iii)(c) of the Senior Note Agreement that constitute Indebtedness; and (x) surety bonds permitted under paragraph 6A(viii) of the Senior Note Agreement. All defined terms set forth in this Subsection 6.1.7 and defined in the Working Capital Facility Agreement or Senior Note Agreement shall have the meanings given to such terms as of the date hereof;

6.1.8 directing, approving or otherwise allowing any payment or declaration of any dividend or other distribution on, or any redemption, acquisition or other purchase of, any Equity Securities or any other direct or indirect equity interests in the Corporation that are junior to the preferences or rights of the Series A Preferred Stock (other than dividends on all shares of Common Stock payable in shares of Common Stock);

6.1.9 directing, approving or otherwise allowing the issuance or transfer of any equity securities of any of the Corporation's Subsidiaries, other than equity securities of wholly-owned Subsidiaries to the Corporation or another wholly-owned Subsidiary;

6.1.10 directing, approving or otherwise allowing any Refinancing other than a Refinancing of an existing credit facility that does not increase the principal amount of or costs associated with (whether via an increased interest rate, additional fees or otherwise), or extend the maturity date of, such facility;

6.1.11 directing, approving or otherwise allowing any (A) acquisition by any Pace Company of the securities, equity interests or assets of any Person, or the acquiring by any Pace Company by any other manner of any business, properties, assets, or Persons, in one transaction or a series of related transactions or (B) disposition, assignment, pledge, mortgage, transfer, lease or sale of assets of the Corporation or any of its Subsidiaries, in either case, with a value or purchase price in excess of $30,000,000 in the case of clause (A) and $20,000,000 in the case of clause (B);

6.1.12 directing, approving or otherwise allowing the aggregate amount of expenditures (whether paid in cash or accrued as liabilities) by the Corporation or any of its Subsidiaries that would be classified as "property, plant or equipment" or comparable items on the consolidated balance sheet of the Corporation and its Subsidiaries, including all transactional costs incurred in connection with such expenditures, to exceed $35,000,000 in the aggregate in any fiscal year of the Corporation;

6.1.13 directing, approving or otherwise allowing any material change in the lines or type of business conducted by the Pace Companies;

6.1.14 directing, approving or otherwise allowing any material modification to the employment terms of any Key Employee; and

6.1.15 directing, approving or otherwise allowing any Change of Control in which the Macquarie Holders would receive an amount in cash with respect to their shares of Series A Preferred Stock less than the amount the Macquarie Holders would receive upon a redemption by the Corporation in accordance with Section 8.

6.2     For the avoidance of doubt, the written consent or affirmative vote of the holders of a majority in interest of the Series A Preferred Stock shall not be required with respect to any of the items specified in Subsection 6.1 (other than Subsection 6.1.15) if all of the Series A Preferred Stock will be redeemed in connection with such action.

7.     Conversion.  The Series A Preferred Stock shall not be convertible into Common Stock or any other class or series of capital stock of the Corporation.

8.     Redemption.

8.1     Optional Redemption.  Unless prohibited by Delaware law governing distributions to stockholders and subject to Subsection 3.3, the Corporation may, at its option, redeem, in the manner provided for herein, all of the outstanding shares of the Series A Preferred Stock (an "**Optional Redemption**") for cash at a price per share equal to the Base Amount plus any accrued Dividends that have not yet increased the Base Amount through the date of such redemption (the "**Optional Redemption Price**").  Notwithstanding anything to the contrary contained herein, if the Corporation elects to redeem the Series A Preferred Stock pursuant to this Subsection 8.1 and (i) the declaration or payment of the dividend contemplated by Subsection 3.3 is prohibited by Delaware law, the Corporation shall not redeem the Series A Preferred Stock until such time as such declaration and payment is not prohibited by Delaware law, or (ii) an Optional Redemption is prohibited by Delaware law, the Corporation shall not redeem the Series A Preferred Stock until such time as an Optional Redemption is not prohibited by Delaware law and, in each case, thereafter shall as soon as reasonably practicable (and in any event with ten (10) days of such action being no longer prohibited by Delaware law) declare the dividend contemplated by Subsection 3.3 and redeem the Series A Preferred Stock in accordance with this Subsection 8.1.

8.2     Mandatory Redemption.  Unless prohibited by Delaware law governing distributions to stockholders and subject to Subsection 3.2, the Corporation shall redeem (a "**Mandatory Redemption**"), in the manner provided for herein, all of the outstanding shares of the Series A Preferred Stock at a price equal to the Base Amount multiplied by the number of outstanding shares of Series A Preferred Stock, plus any accrued Dividends that have not yet increased the Base Amount through the date of such redemption (the "**Mandatory Redemption Price**") upon the earliest to occur of: (a) any voluntary or involuntary liquidation, dissolution or winding up of the Corporation; (b) the consummation of any transaction or event that results in a Change of Control; (c) the closing of the sale of shares of common equity of KPI Holdings, LLC or any of its direct or indirect Subsidiaries (including the Common Stock of the Corporation) to the public; and (d) December 31, 2020 (each, a "**Mandatory Redemption Event**" and, the date of such Mandatory Redemption Event, the "**Mandatory Redemption Date**").  In the event of a

Mandatory Redemption Event pursuant to <u>Subsection 8.2(b)</u> or <u>8.2(c)</u>, the Corporation shall apply all of its assets to any such redemption to the extent necessary to pay the Mandatory Redemption Price, and to no other corporate purpose, except to the extent prohibited by Delaware law governing distributions to stockholders.  Notwithstanding anything to the contrary contained herein, if (i) the declaration or payment of the dividend contemplated by <u>Subsection 3.2</u> is prohibited by Delaware law, the Corporation shall not redeem the Series A Preferred Stock until such time as such declaration and payment is not prohibited by Delaware law, or (ii) a Mandatory Redemption is prohibited by Delaware law, the Corporation shall not redeem the Series A Preferred Stock until such time as a Mandatory Redemption is not prohibited by Delaware law and, in each case, thereafter shall as soon as reasonably practicable (and in any event with ten (10) days of such action being no longer prohibited by Delaware law) declare the dividend contemplated by <u>Subsection 3.2</u> and redeem the Series A Preferred Stock in accordance with this <u>Subsection 8.2</u>.

8.3    <u>Procedures for Redemption</u>.

8.3.1    At least ten (10) days (or such lesser number of days to which the holders of a majority of the Series A Preferred Stock agree) prior to the Mandatory Redemption Date or any date fixed for any Optional Redemption pursuant to <u>Subsection 8.1</u> (the "**Optional Redemption Date**"), the Corporation shall send written notice to each holder of record of Series A Preferred Stock; <u>provided</u>, that no failure to give such notice nor any deficiency therein shall affect the validity of the procedure for the redemption of the Series A Preferred Stock, except in the case of an Optional Redemption, as to the holder or holders to whom the Corporation has failed to give said notice or to whom such notice was defective.  The redemption notice (the "**Redemption Notice**") shall state the following:

(a)    the Mandatory Redemption Date or Optional Redemption Date, as applicable;

(b)    in the case of an Optional Redemption, the number of shares of Series A Preferred Stock to be redeemed;

(c)    the amount of the dividend that will be declared with respect to the shares of Series A Preferred Stock that are the subject of such Mandatory Redemption or Optional Redemption pursuant to <u>Subsection 3.2</u> or <u>Subsection 3.3</u>, respectively;

(d)    the Optional Redemption Price or Mandatory Redemption Price, as applicable, payable on the Mandatory Redemption Date or Optional Redemption Date, as applicable; and

(e)    that the Dividends shall cease to accrue on and after such Mandatory Redemption Date or Optional Redemption Date, as applicable, with respect to the shares of Series A Preferred Stock to be redeemed as a result of such Mandatory Redemption or Optional Redemption, as the case may be.

8.4    <u>Rights Subsequent to Redemption</u>.  On and after the Mandatory Redemption Date or Optional Redemption Date, as applicable, the Dividends on the Series A

Preferred Stock redeemed as a result of such Mandatory Redemption or Optional Redemption, as the case may be, shall cease to accrue, and all rights of the holders of redeemed shares shall terminate with respect thereto on such date, other than the right to receive the Mandatory Redemption Price or Optional Redemption Price, as applicable, without interest.

8.5    <u>Surrender of Certificates; Payment</u>.    On or before the Mandatory Redemption Date or Optional Redemption Date, as applicable, each holder of shares of Series A Preferred Stock shall, if a holder of shares in certificated form, surrender the certificate or certificates representing such shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the Optional Redemption Price or Mandatory Redemption Price, as applicable, for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof.    In the event such Optional Redemption Price or Mandatory Redemption Price is not paid within three (3) days after the Optional Redemption Date or Mandatory Redemption Date, all certificates representing such shares shall promptly be returned to the holders thereof.    In the event less than all of the shares of Series A Preferred Stock represented by a certificate are redeemed, a new certificate, instrument, or book entry representing the unredeemed shares of Series A Preferred Stock shall promptly be issued to such holder.

9.    <u>Redeemed or Otherwise Acquired Shares</u>.    Any shares of Series A Preferred Stock that are redeemed, purchased or otherwise acquired by any Pace Company shall be automatically and immediately cancelled and retired and shall not be reissued, sold or transferred.    No Pace Company may exercise any voting or other rights granted to the holders of Series A Preferred Stock.

10.    <u>Certain Transfers</u>.    No holder of Series A Preferred Stock shall Transfer any shares of Series A Preferred Stock to any Person that is directly or indirectly engaged in the Business.

11.    <u>Waiver</u>.    Any of the rights, powers, privileges and other terms of the Series A Preferred Stock set forth herein may be waived prospectively or retrospectively on behalf of all holders of the Series A Preferred Stock by the affirmative written consent or vote of the holders of the majority in interest of the shares of Series A Preferred Stock then outstanding.

12.    <u>Notices</u>.    Except as otherwise provided herein, any notice required or permitted by the provisions of this <u>Article IV</u> to be given to a holder of shares of Series A Preferred Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation, or given by electronic communication in compliance with the provisions of the General Corporation Law, and shall be deemed sent upon such mailing or electronic transmission.

C.    **PREFERRED STOCK.**

13

1.    <u>Designation and Issuance</u>.  Subject to the approval rights contained in <u>Article IV</u>, <u>Part B</u>, <u>Section 6</u> of this Restated Certificate, authority is hereby expressly granted to the Board to (i) direct the filing of a certificate of designation with the Secretary of State of the State of Delaware to establish and fix the number of shares of Preferred Stock to be included in a new series of Preferred Stock and the designation, rights, preferences, powers privileges and restrictions, qualifications and limitations of the shares of such new series, including without limitation thereof dividend rights, conversion rights, redemption privileges and liquidation preferences, and (ii) issue shares of such new series of Preferred Stock from time to time, each share of such series to have such terms as stated or expressed in the applicable certificate of designation.  Except with respect to Series A Preferred Stock, any shares of Preferred Stock which may be redeemed, purchased or otherwise acquired by the Corporation may be reissued except as otherwise provided by law.  Different series of Preferred Stock shall not be construed to constitute different classes of shares for the purposes of voting by classes unless expressly provided.

Subject to the rights contained in <u>Article IV</u>, <u>Part B</u>, <u>Section 6</u> of the Restated Certificate and except as otherwise provided herein or to the extent class or series voting is otherwise required by law or agreement, without limiting the generality of the foregoing, the certificate of designation of any series of Preferred Stock may provide that such series shall be superior or rank equally or be junior to the Preferred Stock of any other series to the extent permitted by law.  Subject to the rights contained in <u>Article IV</u>, <u>Part B</u>, <u>Section 6</u> of the Restated Certificate and except as otherwise provided herein or to the extent class or series voting is otherwise required by law or agreement, no vote of the holders of the Preferred Stock or Common Stock shall be a prerequisite to the issuance of any shares of any series of Preferred Stock authorized by and complying with the conditions of the Restated Certificate, the right to have such vote being expressly waived by all present and future holders of the capital stock of the Corporation.

## ARTICLE V
## BOARD OF DIRECTORS

**A.    NUMBER OF DIRECTORS**.  The number of directors of the Corporation shall be determined as set forth in the Bylaws.

**B.    VOTING RIGHTS**.  Each member of the Board shall be entitled to one vote on any matter.

## ARTICLE VI
## BYLAW PROVISIONS

**A.    AMENDMENT OF BYLAWS**.  Subject to any additional vote required by the Restated Certificate or Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**B.    BOARD COMMITTEES**.  The Board may establish committees, as permitted by the General Corporation Law and the Bylaws.

C.    **BALLOT**.  Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

D.    **MEETINGS AND BOOKS**.  Meetings of stockholders may be held within or without the State of Delaware, or as the Bylaws of the Corporation may provide.  The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board or in the Bylaws of the Corporation.

E.    **FORUM**.  Unless the Corporation (as determined by its Board) consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's certificate of incorporation or bylaws, or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten (10) days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction.  If any provision or provisions of this <u>Article VI</u> shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this <u>Article VI</u> (including, without limitation, each portion of any sentence of this <u>Article VI</u> containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

ARTICLE VII
DIRECTOR LIABILITY

A.    <u>LIMITATION</u>.  To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.  If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this <u>Article VII</u> to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

B.    <u>INDEMNIFICATION</u>.  To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions,

agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law.  Any amendment, repeal or modification of the foregoing provisions of this <u>Article VII</u> shall not adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification.

C.    <u>MODIFICATION</u>.    Any repeal or modification of the foregoing provisions of this <u>Article VII</u> by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

* * * * *